Debra K. MATTICK, Respondent,

v.

HY-VEE FOODS STORES, Self-Insured/EMC Risk Services, Inc., Relators,

and

Mayo Clinic and Hartford Life, Intervenors.

A16-1802

Supreme Court of Minnesota.

Filed: July 12, 2017

Dana L. Gerber, Atkinson Law Office, Saint Paul, Minnesota, for respondent.

Jeffrey J. Lindquist, Pustorino, Tilton, Parrington & Lindquist, PLLC, Minneapolis, Minnesota, for relators.

## OPINION

MCKEIG, Justice.

This case requires us to determine whether the Workers' Compensation Court of Appeals (WCCA) exceeded the scope of its review when it reversed the compensation judge's decision to deny benefits to respondent-employee Debra K. Mattick. Because the compensation judge's decision was supported by substantial evidence, we conclude that the WCCA exceeded the scope of its review. Accordingly, we reverse the WCCA's decision and reinstate the compensation judge's decision.

## FACTS

Mattick has worked as a cake decorator at a Hy-Vee store in Albert Lea since 2001. In 2000, before she began working for Hy-Vee, Mattick fractured her right ankle and underwent surgery. The frac-

ture did not heal properly, and a second surgery was required. After completing physical therapy, Mattick soon returned to working as a cake decorator. She also engaged in active recreational activities including sand volleyball and biking. Her current job at Hy-Vee requires her to work on her feet for 40 to 45 hours per week.

Four years after the 2000 injury, Mattick experienced pain in her right ankle for about a month. She was diagnosed with post-traumatic arthritis and was advised to treat her ankle at home with arch supports, an ankle brace, icing, stretching, and anti-inflammatory drugs.

Mattick testified that from 2004 to 2014, she felt minor pain and swelling in her right ankle several times per year, usually coinciding with changes in the weather. She treated the symptoms at home by taking anti-inflammatory drugs and wearing an ankle brace when playing sports.

On January 18, 2014, while working at Hy-Vee, Mattick tripped over a pallet and twisted her right ankle. She finished her work shift, iced and wrapped her ankle for 24 hours, and worked another full day with her ankle wrapped before seeking medical treatment on January 20. Mattick's ankle exhibited only mild swelling with no bruising, but x-rays showed "[d]egenerative changes at the ankle joint." She was diagnosed with a sprain and was instructed to wear an ankle brace, elevate her ankle, take anti-inflammatory drugs, and place weight on the ankle "as tolerated." Following the work injury, Mattick continued working full-time at Hy-Vee, but testified that she was unable to engage in recreational activities.

A week after the work injury, Mattick followed up with her treating physician, Dr. Schulz. Although Mattick testified that her swelling and pain worsened continuously after the work injury, Dr. Schulz recorded that Mattick was already experiencing decreased swelling and pain during this first follow-up appointment. He told her to continue wearing a brace and placing weight on the ankle as tolerated.

Mattick followed up with Dr. Schulz again approximately 6 weeks later. Although Mattick told Dr. Schulz that her ankle was "about the same," Dr. Schulz noted a "slight improvement" since her last visit. He prescribed 4 weeks of physical therapy, but imposed no work restrictions.

Dr. Schulz reported that Mattick's ankle improved further with physical therapy. But in March 2014, while Mattick was still pursuing physical therapy, she again twisted her right ankle during an incident unrelated to her job at Hy-Vee. At Mattick's next follow-up appointment, Dr. Schulz noted some swelling and "soft tissue damage from the recent re-injury." He concluded that the re-injury "set [Mattick] back" in her recovery. Dr. Schulz again released Mattick without work restrictions and instructed her to continue taking anti-inflammatory drugs and attending physical therapy. Mattick experienced increased pain and swelling for several weeks, after which she reported intermittent "good and bad days."

At her next follow-up appointment in April, Dr. Schulz changed Mattick's diagnosis from solely an ankle sprain to an "[a]nkle sprain in the setting of previous degenerative changes of the ankle" and referred her to a podiatrist, Dr. Collier. Dr. Collier took x-rays of the ankle, which showed "significant degenerative changes" with "some bone on bone contact." He diagnosed Mattick with a "lateral ankle sprain with exacerbation of arthritis," injected the ankle with cortisone to calm the inflammation, and instructed Mattick to wear a walking boot. A few weeks later,

Dr. Collier noted a "slight improvement" in Mattick's ankle and changed her diagnosis to solely "[d]egenerative arthritis." He provided a second cortisone injection.

Mattick did not follow up with Dr. Collier again for 5 months. In October 2014, Dr. Collier noted that Mattick's "significant degenerative arthritis" had been "progressively getting worse." He commented that her "secondary injury at work" had "led to the most recent episode of pain." Dr. Collier discussed with Mattick the possibility of ankle-fusion surgery as a more extensive treatment for her arthritis.

Mattick filed a workers' compensation claim petition for the ankle-fusion surgery in January 2015. Five months later, she consulted with an orthopedic surgeon, Dr. Ryssman. By this time, her ankle pain was "excruciating." Dr. Ryssman concluded that Mattick had "[a]dvanced degenerative arthritis" and scheduled her for the ankle-fusion surgery. Mattick underwent surgery on August 31, 2015.

During the proceedings before the compensation judge, the parties submitted the reports of several medical experts. Dr. Collier and Dr. Ryssman submitted reports based on their treatment of Mattick. Dr. Collier opined that, although Mattick's work injury was "not the primary cause of the arthritis," it "certainly led to the flare up along with the ankle sprain that she received." He also completed a Health Care Provider Report Form on which he selected "yes" to the question of whether Mattick's condition was "caused, aggravated or accelerated" by her work.

Dr. Ryssman explicitly declined to comment on whether the work injury aggravated Mattick's arthritis, stating that he had insufficient information regarding her pre-injury status as well as her treatment shortly after the injury. But he opined that Mattick's "non-surgical treatment prior to

meeting with [him] was appropriate for ankle arthritis."

The parties also submitted reports from independent medical experts, both experienced orthopedic surgeons. Hy-Vee's expert, Dr. Fey, examined and interviewed Mattick before her ankle-fusion surgery. Based on this examination and his review of all of Mattick's relevant medical records, Dr. Fey concluded that there was "no objective basis" for finding that the work injury "accelerated or in any way modified" Mattick's arthritis condition. In his lengthy report, he explained that the sprain arising out of Mattick's work injury was "mild and temporary," as evidenced by her ability to return to work immediately, the results of her exam and x-ray two days later, and the conservative treatment ordered. According to Dr. Fey, the "natural history" of such an injury is typically a 2-month recovery. Mattick's arthritis, however, had been diagnosed 10 years before the work injury, and the "natural history" of degenerative arthritis was "waxing and waning symptoms" with "overall progression of the disease." Although Dr. Fey acknowledged Mattick's ongoing pain after the work injury, he noted that her diagnosis transitioned from a sprain to degenerative arthritis, and the treatment escalated accordingly from at-home remedies to injections and surgery. Dr. Fey reiterated his opinion in two additional reports that he prepared after reviewing Mattick's medical records from the ankle-fusion surgery and the other expert reports in the record.

Mattick's expert, Dr. Bert, examined and interviewed Mattick after her ankle-fusion surgery. Based on this examination as well as his review of all of Mattick's relevant medical records and Dr. Fey's report, he concluded that the work injury permanently aggravated Mattick's arthritis. In his brief report, Dr. Bert explained

that the work injury was "clearly a substantial contributing factor to [Mattick's] need for surgery" because of the change in her ability to "participate in significant physical activity" before and after the work injury.

The compensation judge denied Mattick's claim for the ankle-fusion surgery. In a 2-1 decision, the WCCA reversed. *Mattick v. Hy-Vee Food Stores*, No. WC16-5946, 2016 WL 6884622, at *9 (Minn. WCCA Oct. 14, 2016). Hy-Vee now seeks review of the WCCA's decision by writ of certiorari.

## ANALYSIS

█ If a work injury "substantially aggravate[s], accelerate[s], or combine[s] with a preexisting disease or latent condition to produce a disability, the entire disability is compensable." *Fleener v. CBM Indus.*, 564 N.W.2d 215, 216 (Minn. 1997) (citation and internal quotation marks omitted). The employee bears the burden of showing by a preponderance of the evidence that the work injury was "an appreciable or substantial contributing cause" of the disability. *Salmon v. Wheelabrator Frye*, 409 N.W.2d 495, 497-98 (Minn. 1987).

Based on Mattick's medical records, her testimony, and the four medical expert reports, the compensation judge concluded that Mattick's work injury was not a substantial contributing cause of the ankle-fusion surgery, but was "temporary" and

had "resolved" before the surgery. The compensation judge found the expert opinion of Dr. Fey to be most persuasive,[1] and concluded that neither Mattick's medical records nor the opinions of her treating physicians supported her claim.

The WCCA reversed, concluding that Dr. Fey's report lacked adequate factual foundation and that the compensation judge's finding that the work injury was not a substantial contributing cause of the surgery was unsupported by the evidence. *Mattick*, 2016 WL 6884622, at *9. The WCCA substituted its own finding that the work injury permanently aggravated Mattick's arthritis, stating that the evidence other than Dr. Fey's report "unambiguously support[s]" this finding. *Id.* at *8.[2]

On appeal, Hy-Vee argues that the WCCA exceeded the scope of its review. When the WCCA substitutes its own findings for those of the compensation judge, we first determine "whether the [WCCA] was correct in setting aside the compensation judge's findings." *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 61 (Minn. 1984). We will reverse the WCCA based on this first step if it "clearly and manifestly erred by rejecting findings supported by substantial evidence and substituting its own findings." *Dykhoff v. Xcel Energy*, 840 N.W.2d 821, 825 (Minn. 2013). Only if the WCCA correctly overturned the compensation judge's findings will we reach the second step: whether the WCCA's substituted findings were "mani-

---

1. The compensation judge stated that Dr. Bert did not review as many medical records as Dr. Fey. After reviewing the record, including Dr. Bert's report and the letter from Mattick's counsel providing medical records for his review, it appears that Dr. Bert reviewed substantially the same records as Dr. Fey. However, because the compensation judge's decision is otherwise supported by substantial evidence as discussed below, any potential error in this comment would not require reversal of the compensation judge's decision.

2. The WCCA considered the aggravation issue in light of the optional six-factor test that it established in *McClellan v. Up N. Plastics*, 1994 WL 604356 (Minn. WCCA Oct. 18, 1994). We need not decide here whether *McClellan* accurately states the law on aggravation because we conclude that, either way, substantial evidence supports the compensation judge's finding.

festly contrary to the evidence." *Henge-muhle*, 358 N.W.2d at 61.

## I.

█ We first address the WCCA's determination that the compensation judge erred by relying on Dr. Fey's expert opinion because it lacked adequate factual foundation. The WCCA did not dispute that Dr. Fey reviewed Mattick's relevant medical records from her 2000 ankle fracture through her ankle-fusion surgery in 2015, in addition to interviewing and examining Mattick. *Mattick*, 2016 WL 6884622, at *7. But the court found specific portions of Dr. Fey's report to be suspect, including his discussion of the "expected natural history" of Mattick's arthritis condition and ankle sprain, as well as his failure to note a 10-year gap in Mattick's symptoms after her arthritis diagnosis in 2004. *Id.*

█ It is well established that a compensation judge's choice among conflicting expert opinions must be upheld unless the opinion lacked adequate factual foundation. *Nord v. City of Cook*, 360 N.W.2d 337, 342-43 (Minn. 1985). An expert opinion lacks adequate foundation when (1) "the opinion does not include the facts and/or data upon which the expert relied in forming the opinion," (2) "it does not explain the basis for the opinion," or (3) "the facts assumed by the expert in rendering an opinion are not supported by the evidence." *Hudson v. Trillium Staffing*, 896 N.W.2d 536, 540-41 (Minn. 2017) (citations and internal quotation marks omitted). The opinion need only be based on "enough facts to form a reasonable opinion that is not based on speculation or conjecture." *Gianotti v. Indep.*

*Sch. Dist. 152*, 889 N.W.2d 796, 802 (Minn. 2017). Whether an expert's opinion rests on adequate foundation "is a decision within the discretion of the trial judge, subject to review for abuse of discretion."[3] *Id.*

In *Gianotti*, decided after the WCCA's decision in this case, we reversed a WCCA decision holding that the expert opinion relied upon by the compensation judge lacked adequate foundation. *Id.* at 802-03. The WCCA discredited the opinion in part because it concluded that the expert had misstated a fact. *Id.* at 802. We held that the compensation judge did not abuse its discretion by relying on the opinion because the expert had reviewed the majority of the employee's medical records from before and after the injury, and had personally examined and interviewed the employee. *Id.* We concluded that a single statement taken out of context did "not discredit the entire report." *Id.*

Here, like in *Gianotti*, the WCCA rejected Dr. Fey's entire report based on a few statements that it took out of context. The specific portions of Dr. Fey's report that the WCCA criticized fail to establish that the report as a whole lacks adequate foundation. Dr. Fey noted the "expected natural history" of degenerative arthritis and an ankle sprain as context for his opinion, but also clearly recounted and analyzed the specifics of Mattick's injuries before opining that her minor sprain could not have permanently aggravated her long-term arthritis condition. Further, although Dr. Fey did not discuss Mattick's condition between 2004 and 2014, his opinion relied primarily on an accurate portrayal of Mattick's condition from 2014 to 2015; specifically, the change in Mattick's

---

**3.** Mattick argues that the WCCA need not defer to the compensation judge's choice among *written* expert opinions because the WCCA is in an equal position to assess the credibility of written evidence. But we have made no distinction between written and testimonial expert opinions. *See Schuette v. City of Hutchinson*, 843 N.W.2d 233, 237 (Minn. 2014) (stating that a compensation judge has the discretion to choose between "competing and conflicting medical experts' *reports and opinions*" (emphasis added)).

diagnosis from an ankle sprain in the setting of preexisting arthritis to solely arthritis well before the ankle-fusion surgery. The facts that Dr. Fey assumed are supported by the record. Accordingly, Dr. Fey's opinion rested on adequate factual foundation, and the compensation judge did not abuse its discretion by relying on it.

## II.

We now turn to the broader issue of whether the WCCA erred by overturning the compensation judge's finding that Mattick's work injury was not a substantial contributing cause of her ankle-fusion surgery. The WCCA reviews a compensation judge's decision to "determine[ ] if the findings and order are supported by substantial evidence in view of the entire record as submitted." *Hengemuhle*, 358 N.W.2d at 59. Substantial evidence is "evidence that a reasonable mind might accept as adequate." *Id.* If "more than one inference may reasonably be drawn from the evidence," the compensation judge's findings must be upheld. *Id.* at 60.

The compensation judge's finding that Mattick's work injury was not a substantial contributing cause of her ankle-fusion surgery is supported, not only by Dr. Fey's expert opinion, but also by substantial evidence elsewhere in the record. All of the medical experts were asked to opine on whether Mattick's work injury permanently aggravated her arthritis condition, but neither of Mattick's treating physicians provided an unequivocal opinion on this issue. Although Mattick's expert, Dr. Bert, opined that Mattick's condition before and after the work injury conclusively established permanent aggravation, Mattick testified that she had experienced intermittent pain and swelling in her ankle for 10 years before the work injury occurred. Indeed, Mattick's x-rays two days

after the work injury showed "[d]egenerative changes at the ankle joint," and her ultimate diagnosis before the ankle-fusion surgery was "[d]egenerative arthritis," indicating that her ankle had deteriorated over time. *See Webster's Third New International Dictionary* 593 (2002) (defining "degenerative arthritis" as "a progressive wearing down of apposing joint surfaces").

Finally, Mattick was not subject to work restrictions after the work injury and was able to continue working on her feet 40 to 45 hours per week. Although she testified that her symptoms worsened continuously after the January 2014 work injury, Mattick's medical records reflect gradual improvement in her ankle until the March 2014 injury "set [her] back" in her recovery. It was not until the months leading up to the ankle-fusion surgery—which took place in August 2015, more than a year and a half after the work injury—that Mattick's symptoms became "excruciating."

Accordingly, the compensation judge's finding was "supported by evidence that a reasonable mind might accept as adequate." *Hengemuhle*, 358 N.W.2d at 59. The WCCA therefore clearly and manifestly erred in rejecting this finding. Thus, we need not evaluate the WCCA's substituted finding under the second step from *Hengemuhle*.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the Workers' Compensation Court of Appeals and reinstate the decision of the compensation judge.

Reversed.